UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DEXILANT (DEXLANSOPRAZOLE) ANTITRUST LITIGATION<br><br>This Document Applies to:<br>ALL CASES | Case No.  25-cv-02785-JSC<br><br>**ORDER RE: DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 132, 148 |

This antitrust lawsuit arises out of a settlement agreement between the manufacturer of protein pump inhibitor Dexilant and a generics manufacturer.  Plaintiffs include retailers Walgreen Co., The Kroger Co., Albertsons Companies, Inc., H-E-B, L.P., Supervalu, Inc., and CVS Pharmacy, Inc.[1] ("Retailer Plaintiffs"), and a putative class of Direct Purchaser Plaintiffs ("DPPs").  (Dkt. Nos. 103, 104; Case No. 25-cv-07646, Dkt. No. 1.)[2]  Defendants include Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., and Takeda Pharmaceuticals America, Inc. ("Takeda"); as well as TWi Pharmaceuticals, TWi Pharmaceuticals USA, Inc., Bora Pharmaceuticals Co., Ltd. ("Bora"), and Upsher-Smith Laboratories, Inc. ("Upsher") ("TWi").  (Dkt. Nos. 103, 104; Case No. 25-cv-07646, Dkt. No. 1.)  Plaintiffs allege reverse payment and market allocation terms in Defendants' patent infringement settlement agreement violated federal antitrust laws.

[1] CVS Pharmacy, Inc. did not join the Retailer Plaintiffs' amended complaint but asserts similar causes of action in its complaint, (Case No. 25-cv-7646-JSC, Dkt. No. 1), and Defendants' motion to dismiss treats it as a Retailer Plaintiff, (Dkt. No. 132 at 12).
[2] Record citations are to material in the Electronic Case File ("ECF") in Case No. 25-cv-02785-JSC, unless otherwise noted; pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Now pending before the Court is Defendants' motion to dismiss. (Dkt. No. 132.) Having carefully considered the parties' submissions, and with the benefit of oral argument on February 3, 2026, the Court GRANTS Defendants' motion to dismiss for claims based upon: (i) Retailer Plaintiffs' alleged injuries before March 25, 2021; (ii) DPPs' alleged injuries before March 31, 2021; and (iii) Plaintiffs' claims against Bora and Upsher. The Court otherwise DENIES Defendants' motion to dismiss. Because Plaintiffs have plausibly alleged Defendants' continuing violation, the antitrust statute of limitations does not bar their claims for injuries within four years of their first complaints. Plaintiffs have also plausibly alleged a reverse payment claim under *FTC v. Actavis*, 570 U.S. 136 (2013), and at this early stage in the proceedings, Defendants have not established Plaintiffs' market allocation claim is not subject to the *per se* rule as a matter of law. Plaintiffs also plausibly allege antitrust injury flowing from Defendants' antitrust violation. And, Defendants' motion to dismiss the End Payer Plaintiffs' state law claims is denied as moot in light of their voluntary dismissal.

## BACKGROUND

### I.    COMPLAINT ALLEGATIONS[3]

#### A.    Brand and Generic Drug Approval Processes

Under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*, brand drug manufacturers must obtain U.S. Food and Drug Administration ("FDA") approval before selling a new drug product. (Dkt. No. 103 ¶ 45.) To obtain approval, manufacturers file a New Drug Application ("NDA") including "specific data concerning the safety and effectiveness of the drug, as well as information about patents that cover the drug or its approved use." (*Id.* (citing 21 U.S.C. § 355(a), (b)). Upon FDA approval, "the manufacturer may direct the FDA to list certain kinds of patents in the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the 'Orange Book')—*i.e.*, patents that (a) claim the drug substance, drug product, or method of using the drug in the approved indication, and ([b]) can 'reasonably be asserted' against

---

[3] The Court adopts the parties' convention of citing only to the Retailer Plaintiffs' amended complaint when the complaints are substantially the same. (Dkt. No. 132 at 15 n.1; Dkt. No. 144 at 12 n.2.)

a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents." (*Id.* ¶ 47 (citing 21 U.S.C. § 355(b)(1), (c)(2)).)

"A drug company that wishes to sell a generic drug must file an Abbreviated New Drug Application ('ANDA') with the FDA," which requires showing the drug product is "bioequivalent to or 'the same as' the brand drug." (*Id.* ¶¶ 59, 61 (citing 21 U.S.C. § 355(j)(2)(A)).) The generic manufacturer must also "certify that the generic drug will not infringe any of the patents listed in the Orange Book." (*Id.* ¶ 64.) One of the four methods of certification is a "Paragraph IV" certification "that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product." (*Id.* (citing 21 U.S.C. § 355(j)(2)(A)(vii)).) However, because a generic manufacturer must notify the brand manufacturer when it files a Paragraph IV certification, the brand manufacturer may initiate a patent infringement suit against the generic manufacturer, which will delay final FDA approval until the earlier of 30 months or a court's determination the patent is invalid or not infringed. (*Id.* ¶ 65 (citing 21 U.S.C. § 355(j)(5)(B)(iii)).) In the meantime, the FDA may grant "tentative approval," but because it cannot authorize the generic manufacturer to market its product, it cannot grant final approval. (*Id.* ¶ 66.)

There are three categories of generic drugs: "(i) first-filer generics, (ii) later generic filers, and (iii) the brand's own authorized generic" ("AG"). (*Id.* ¶ 67.) Under the Hatch-Waxman Amendments, the first generic manufacturer to file an ANDA—the first-filer generic—with a Paragraph IV certification receives a "180-day period to market the generic version of the drug, during which time the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug." (*Id.* ¶ 68.) However, a first filer can forfeit its 180-day exclusivity if it "does not obtain tentative approval within 30 months of filing its ANDA." (*Id.* ¶ 72 (citing 21 U.S.C. § 355(j)(5)(D)(i)(IV)).) A first filer can also forfeit its 180-day exclusivity when: "(i) a later filer receives a final judgment that their proposed ANDA product either does not infringe the patents certified against by the first filer or that such patents are invalid; and (ii) the first filer fails to market before 75 days have passed since such judgment from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken." (*Id.*

3

¶ 73 (citing 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA)).)

Generally, "the first generic manufacturer to launch prices its product below the prices of its brand counterpart," and "almost always captures a large share of sales from the brand version of the drug." (*Id.* ¶ 75.) "Once multiple generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs." (*Id.* ¶ 78.) However, a brand drug manufacturer may launch "an authorized generic or an unbranded version of its own brand drug, under its own NDA, at any time," which it often does "in response to actual or anticipated generic entry in order to recoup some of the sales they would otherwise lose to a generic product." (*Id.* ¶ 70.)

### B.      Dexilant NDA and Generic ANDA Filings

Dexlansoprazole is a "proton pump inhibitor ('PPI') used to treat all grades of erosive esophagitis, maintain the healing of esophagitis, and treat heartburn associated with GERD [(gastroesophageal reflux disease)]" by reducing stomach acid production. (*Id.* ¶¶ 3, 112-113.) The FDA approved Takeda's NDA for Dexilant, its brand name for dexlansoprazole, in 30 mg and 60 mg dosage forms in January 2009. (*Id.* ¶¶ 111, 114.) Dexilant "generated significant revenue and profits for Takeda," including more than a billion dollars annually from 2015 until 2022. (*Id.* ¶ 117.)

Other pharmaceutical companies sought approval for generic versions of dexlansoprazole. (*Id.* ¶ 118.) On August 25, 2010, Handa Pharmaceuticals, LLC ("Handa") became the first ANDA filer for the 60 mg dosage dexlansoprazole. (*Id.* ¶ 122.) Handa later transferred its ANDA to Par, which received tentative approval on December 26, 2013 and final approval on April 19, 2017. (*Id.*) On November 30, 2010, Impax became the first ANDA filer for the 30 mg dosage dexlansoprazole. (*Id.* ¶ 123.) Anchen Pharmaceuticals, Inc. ("Anchen") also filed an ANDA for 30 mg and 60 mg dexlansoprazole, which it transferred to TWi in May 2011. (*Id.* ¶ 124.) However, because Takeda had listed patents expiring between 2020 and 2032 in the Orange Book, generic manufacturers filing ANDAs for dexlansoprazole "were required to make one of the four patent certifications required for the listed patents at the time the FDA approved its ANDA for

4

review." (*Id.* ¶¶ 119-121.)  So, all three ANDAs contained Paragraph IV certifications to the Dexilant patents listed in the Orange Book, but not to U.S. Patent No. 7,737,282 ("the '282 Patent"), which was not listed in the Orange Book.  (*Id.* ¶¶ 120, 122-124.)

### C.       Patent Infringement Litigation

#### 1.       *Takeda Pharmaceutical Co. Ltd. et al v. Anchen Pharmaceuticals, Inc.,* No. 11-CV-01609-JCS (N.D. Cal. filed Apr. 1, 2011)

In early 2011, Takeda filed patent infringement actions against generic manufacturers who had filed ANDAs with Paragraph IV certifications, including Handa, Impax, and Anchen, and the cases were consolidated in front of Judge Spero.  (*Id.* ¶¶ 126-128.)  Takeda added TWi as a defendant and dismissed its claims against Anchen after TWi acquired Anchen's ANDA, and added Par as a defendant after Par acquired Handa's ANDA.  (*Id.* ¶¶ 129-130.)  Across the consolidated cases, Takeda asserted infringement of its '282 Patent, as well as U.S. Patent No. 7,790,755 ("the '755 Patent"); U.S. Patent No. 6,462,058 ("the '058 Patent"); U.S. Patent No. 6,664,276 ("the '276 Patent"); U.S. Patent No. 6,939,971 ("the '971 Patent"); and U.S. Patent No. 7,285,668 ("the '668 Patent").  (*Id.* ¶¶ 120, 127, 129.)

On November 16, 2012, the court entered a Final Judgment TWi's ANDA did not infringe the '058, '276, '971, and '668 Patents.  (*Id.* ¶ 132.)  So, the only remaining infringement claims against TWi related to the '282 and '755 Patents.  (*Id.*)  Then, on April 8, 2013, Judge Spero granted summary judgment of noninfringement by Handa/Par, TWi, and Impax on the '755 Patent, and summary judgment of infringement by Handa/Par and TWi on the '282 Patent.  (*Id.* ¶¶ 135-136.)  After a bench trial, Judge Spero rejected TWi's argument the '282 Patent was invalid, held TWi's proposed generic product infringed only the '282 Patent, and enjoined TWi's ANDA product until the '282 Patent expired on June 15, 2020.  (*Id.* ¶¶ 139-141.)  Because Judge Spero also held Par and Impax had infringed other patents with December 20, 2020 expiration dates, "TWi effectively leapfrogged Par and Impax in its ability to come to market, as they had now lost their first filer status with their losses at trial and TWi's noninfringement wins."  (*Id.* ¶¶ 120 & n.34, 138-139, 143.)  "[I]n a post-trial press statement, [Takeda announced] that '[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020."  (*Id.* ¶ 144.)

TWi, Impax, and Par appealed to the Federal Circuit, and Takeda cross-appealed Judge Spero's grant of summary judgment of non-infringement to TWi on the '755 Patent. (*Id.* ¶¶ 160.) TWi's appeal "presented a strong argument for reversing its sole loss to Takeda on the '282 Patent" at the Federal Circuit, which held argument in March 2015. (*Id.* ¶ 11.)

**2.    *Par Pharmaceutical, Inc. et al v. Takeda Pharmaceutical Co., Ltd. et al*, No. 13-CV-01927-LHK (N.D. Cal. filed Apr. 26, 2013)[4]**

In 2013, Takeda also sued Par, Impax, TWi, and others for infringing U.S. Patent No. 8,173,158 ("the '158 Patent) and U.S. Patent No. 8,461,187 ("the '187 Patent"), and the cases were assigned to Judge Koh. (*Id.* ¶ 9.) On April 10, 2015, Judge Koh granted in part and denied in part the parties' cross-motions for summary judgment, and the infringement claims on both patents were set to proceed to trial. (*Id.* ¶ 10.) "TWi would [] likely have prevailed in any jury trial involving the '158 and '187 Patents." (*Id.* ¶ 13.)[5]

**D.    Takeda and TWi Settlement**

Takeda settled all the patent infringement claims before the Federal Circuit's appellate decision or Judge Koh's trial. Specifically, Takeda settled patent claims with Par around July 18, 2014; with Impax around October 16, 2014; and with TWi around April 27, 2015. (*Id.* ¶¶ 164-166.) "Takeda's agreement with TWi to resolve their ongoing patent disputes regarding Dexilant was a 'reverse payment' agreement in violation of the antitrust laws." (*Id.* ¶ 169.) Despite TWi's "strong, favorable arguments" for Judge Koh's trial and "strong appellate position" before the Federal Circuit, and "the June 15, 2020[] expiration date of the '282 patent, TWi agreed to delay entry of its generic Dexilant product until January of 2022—approximately 18 months" after the expiration of the '282 patent. (*Id.* ¶¶ 172-173.) "TWi agreed to this delay because Takeda agreed

---

[4] In Case No. 13-CV-01927-LHK, Par and Handa sued Takeda for a declaratory judgment of invalidity or noninfringement on the '626 and '158 Patents, and Takeda counterclaimed for infringement of the '158 and '187 Patents. (Case No. 13-CV-01927-LHK, Dkt. Nos. 1, 32.) Judge Koh subsequently related Case No. 13-CV-02416-LHK, in which Takeda had sued Impax for infringing the '158 and '187 Patents, (Case No. 13-CV-02416-LHK, Dkt. No. 22), and Case No. 13-CV-02420-LHK, in which Takeda had sued TWi for infringing the '158 and '187 Patents, (Case No. 13-CV-02416-LHK, Dkt. No. 17). (Case No. 13-CV-01927-LHK, Dkt. No. 29.)

[5] As to the non-litigated Takeda patents for Dexilant, "it would have been easy tor TWi to either design around or 'carve out' the patent uses from its product label" or "advance[] successful noninfringement, invalidity or unenforceability defenses." (*Id.* ¶ 159.)

United States District Court
Northern District of California

to provide a large and unjustified payment to TWi in return." (*Id.* ¶ 174.)

Specifically, TWi's annual financial report stated Takeda had paid TWi $9.5 million to settle the pending patent litigation. (*Id.* ¶¶ 175.) In addition, "Takeda gave TWi the option of launching an AG version of Dexilant rather than launching its own ANDA product." (*Id.* ¶ 178.) Furthermore, after the settlement, TWi issued a press release announcing a licensing agreement for "'TWi and its affiliates to sell Dexilant® in both dosage strengths as *the* Authorized Generic,'" which "'allows TWi to be *the supplier of both strengths of a generic Dexilant® in the U.S. market for a period, which provides significant sales and marketing advantage*." (*Id.* ¶ 182 (emphasis in complaint).) So, Takeda did not "retain[] the right to launch a second AG in competition with the AG launched by TWi," and therefore "effectively gave TWi the option to be the exclusive seller of generic Dexilant for a period of time." (*Id.* ¶¶ 181, 184.) "This promise was extremely valuable to TWi." (*Id.* ¶ 181.) Specifically, because TWi made more than $328 million from selling AG Dexilant in 2022, and Takeda "would have likely captured about half of those sales" had it launched its own AG, Takeda "effectively gave up half of the $328 million in AG sales." (Case No. 25-cv-07646-JSC, Dkt. No. 1 ¶¶ 180-181; Dkt. No. 103 ¶¶ 191-192 (explaining Takeda's AG "would have captured a large share of [TWi's 2022] sales," so "[b]y giving TWi the option to launch the AG rather than Takeda, Takeda effectively gave up at least a portion of the sales it would have made by launching an AG.").) And, even accounting for a 50% royalty rate to Takeda, TWi made $54.7 million more selling AG Dexilant as the only generic on the market than it would have if competing with Takeda's AG. (Case No. 25-cv-07646-JSC, Dkt. No. 1 ¶¶ 196.)

Together, these payments "far exceeded any reasonable estimate of Takeda's saved future litigation expenses," given the status of pending litigation. (*Id.* ¶ 176.)

### E.    Post-Settlement Market

Although the '282 Patent expired on June 15, 2020, TWi chose not to enter the market until around January 1, 2022, when it launched an AG pursuant to its agreement with Takeda. (*Id.* ¶ 185.) So, Takeda benefited from the agreement "because it avoided AB-rated generic competition from TWi and was the sole seller of Dexilant in either branded or generic form from

June 15, 2020 until January 1, 2022." (*Id.* ¶ 189.) During this time, Takeda "had monopoly power in the market for Dexilant" and could "maintain the price of dexlansoprazole at supracompetitive levels without losing enough sales to make those supracompetitive prices unprofitable." (*Id.* ¶ 218.)

In addition, Takeda never launched its own AG Dexilant to compete with TWi, so TWi's AG product "was the sole generic on the market for nearly a year," from January 1, 2022 "until November 22, 2022, when Par launched a generic 60 mg dexlansoprazole delayed release capsule." (*Id.* ¶¶ 186-187.) "TWi [therefore] benefited by enjoying a monopoly on sales of generic Dexilant from January 2022 through November 2022," which "compensated TWi for delaying its entry into the market." (*Id.* ¶ 193.) "Takeda also likely received some portion of the supracompetitive profits earned by TWi during the period when TWi was the only seller of generic Dexilant on the market." (*Id.* ¶ 189.) Ultimately, "[f]rom January 1, 2022, through November 2022 and beyond, TWi sold AG Dexilant at prices well in excess of marginal cost and in excess of the competitive price." (*Id.* ¶ 224.)

Absent Takeda and TWi's agreement, at least two generics (Takeda's and TWi's) would have been available by June 15, 2020, when the '282 Patent expired, rather than just the branded Dexilant. (*Id.* ¶ 210.) Although TWi ultimately did not obtain ANDA approval until September 2022, the settlement agreement "disincentivized TWi from aggressively seeking earlier [ANDA] approval and eliminated the need for FDA to act on TWi's application sooner," but "the likelihood of the FDA approving TWi's ANDA prior to June [] 2020 is [] high." (*Id.* ¶¶ 211, 214.) In addition, although Par and Impax had been the first filers, they forfeited their exclusivity due to delays in tentative approvals and the trial findings of noninfringement as to TWi on patents blocking Par and Impax. (*Id.* ¶ 212.) Furthermore, TWi "would have prevailed" on Takeda's infringement claims as to the '187 and '158 Patents, which expired in 2026 and 2030, respectively, so "Takeda's patents would not have delayed TWi's entry date" beyond June 15, 2020, when the '282 Patent expired. (*Id.* ¶ 213.)

In addition, "Bora understood Takeda's strategies and supported them once Bora acquired TWi in October of 2022." (*Id.* ¶ 229.) And "Upsher was aware of Takeda's strategies at least at

the time it was acquired by Bora and merged with TWi" in 2024.  (*Id.* ¶ 230.)

## II.    PROCEDURAL HISTORY

On March 25, 2025, Retailer Plaintiffs sued (1) Takeda and TWi for violating Sherman Act Section 1, 15 U.S.C. § 1; and (2) Takeda for monopolization in violation of Sherman Act Section 2, 15 U.S.C. § 2.  (Dkt. No. 1.)[6]  On March 31, 2025, DPPs sued (1) Takeda and TWi for a reverse payment in violation of Sherman Act Sections 1 and 3, 15 U.S.C. §§ 1, 3; (2) Takeda and TWi for market allocation in violation of Sherman Act Sections 1 and 3, 15 U.S.C. §§ 1, 3; and (3) Takeda for monopolization in violation of Sherman Act Section 2, 15 U.S.C. § 2.  (Case No. 25-cv-2966, Dkt. No. 1.)  The Court subsequently related Case Nos. 25-cv-2966, 25-cv-3189, 25-cv-3319, 25-cv-3341, 25-cv-3734, 25-cv-3648, 25-cv-4547, 25-cv-4405, and 25-cv-7646, (Dkt. Nos. 26, 29, 33, 38, 51, 78, 88, 123); consolidated the related cases under No. 25-cv-2785, (Dkt. No. 52); and appointed interim class counsel, (Dkt. No. 80).

Plaintiffs then filed amended complaints.  First, Retailer Plaintiffs' amended complaint asserts (1) Takeda's and TWi's unreasonable restraint of trade in violation of Sherman Act Section 1; (2) Takeda's and TWi's *per se* market allocation in violation of Sherman Act Section 1; (3) and Takeda's monopolization in violation of Sherman Act Section 2.  (Dkt. No. 103.)  Second, DPPs assert the same claims under Sherman Act Sections 1, 2 and 3.  (Dkt. No. 104.)  Third, a putative class of End Payer Plaintiffs asserted claims for (1) conspiracy and combination in restraint of trade under state antitrust statutes; (2) monopolization under state antitrust statutes; (3) violations of state consumer protection statutes; (4) and unjust enrichment, but they have since voluntarily dismissed their claims.  (Dkt. Nos. 106, 158.)  Defendants now move to dismiss all Plaintiffs' claims.  (Dkt. No. 132.)

## DISCUSSION

## I.    STATUTE OF LIMITATIONS

"The basic rule is that damages are recoverable under the federal antitrust acts only if suit [] is 'commenced within four years after the cause of action accrued,' . . . plus any additional

---

[6] CVS Pharmacy, Inc. separately sued Takeda and TWi on September 9, 2025.  (Case No. 25-cv-7646-JSC, Dkt. No. 1.)

9

number of years during which the statute of limitations was tolled." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) (quoting 15 U.S.C. § 15b). "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Id.* (citations omitted); *see also Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274-75 (9th Cir. 1988) (holding an antitrust claim's accrual "is determined according to the date on which injury occurs"); *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) ("We do not require a plaintiff to actually discover its antitrust claims before the statute of limitations begins to run." (citation omitted)).

The statute of limitations is an affirmative defense which a defendant must prove. *See California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995). So, "[a] claim may be dismissed as untimely pursuant to a 12(b)(6) motion 'only when the running of the statute [of limitations] is apparent on the face of the complaint.'" *United States ex re. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013) (citation omitted); *see also Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013) ("[P]laintiffs ordinarily need not 'plead on the subject of an anticipated affirmative defense.' When an affirmative defense is obvious on the face of a complaint, however, a defendant can raise that defense in a motion to dismiss." (citations omitted)).

Defendants argue Plaintiffs' antitrust claims accrued upon Takeda's and TWI's April 27, 2015 settlement, so the statute of limitations ran on April 27, 2019, nearly six years before Plaintiffs filed their first complaint on March 25, 2025. (Dkt. No. 132 at 19-20.) But Defendants have not met their burden of proving Plaintiffs' claims accrued in 2015. *See California Sansome*, 55 F.3d at 1406 ("A defendant raising the statute of limitations as an affirmative defense has the burden of proving the action is time barred."). "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him." *Zenith Radio*, 401 U.S. at 339. However, "[a]ntitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (citations omitted). Here, although Plaintiffs allege Takeda and TWi formed their agreement in 2015, Defendants do not identify any

10

allegations which require the inference the agreement had any anticompetitive impact in 2015.

The cases Defendants cite demonstrate the insufficiency of their motion. In *Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.*, 688 F.2d 689 (9th Cir. 1982), the statute of limitations began to run when the plaintiff had to sell its syndication rights as part of an allegedly illegal tying arrangement. *Id.* at 693-94. And, in *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68 (9th Cir. 1979), the statute began to run when the plaintiffs were excluded from the afterburner market. *Id.* at 71. Here, however, Defendants identify no alleged injury Plaintiffs suffered in 2015. Nor could they. At best, Plaintiffs allege absent the challenged agreement, TWi's generic dexlansoprazole would have entered the market when Takeda's '282 Patent expired on June 15, 2020. So, as Plaintiffs do not allege any earlier adverse impact from the settlement, no cause of action could accrue before 2020. *See Zenith Radio*, 401 U.S. at 339; *see also Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 130 (4th Cir. 2021) (explaining the defendant "possessed *legal* monopoly power during the period of its patent license," and only "willfully maintained illegal monopoly power . . . after the patent expired"). So, Defendants have not met their burden of proving Plaintiffs' claims are time barred.

Nevertheless, as Plaintiffs conceded at oral argument, they did not file a complaint before March 25, 2025, more than four years after June 15, 2020. So, Plaintiffs' antitrust claims remain time barred unless Plaintiffs have plausibly alleged the fraudulent concealment or continuing violation doctrine tolled the statute of limitations. *See Hinton v. Pac. Enters.*, 5 F.3d 391, 395 (9th Cir. 1993) ("The burden of alleging facts which would give rise to tolling falls upon the plaintiff." (citations omitted)).

### A. Fraudulent Concealment

"A statute of limitations may be tolled if the defendant fraudulently concealed the existence of the cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel*, 681 F.3d at 1060 (citation omitted). "The plaintiff carries the burden of pleading and proving fraudulent concealment." *Id.* (cleaned up). The plaintiff must plausibly allege (1) "the defendant affirmatively misled it," and (2) "the plaintiff had neither actual nor constructive knowledge of the facts giving rise to its claim" (3) "despite its diligence in trying

United States District Court
Northern District of California

to uncover those facts." *Id.* (cleaned up). "Moreover, allegations of fraudulent concealment must be pled with particularity" under Federal Rule of Civil Procedure 9(b). *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1214 (N.D. Cal. 2015) (citing *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988)).

As to the first element, a plaintiff must allege "its failure to have notice of its claim was the result of affirmative conduct by the defendant." *Conmar*, 858 F.2d at 505 (citations omitted); *see, e.g.*, *Animation Workers*, 87 F. Supp. 3d at 1216 (explaining "public misrepresentations by the defendants that they were not engaging in anticompetitive conduct," "efforts taken to destroy evidence," or "numerous specific pretextual reasons for inflated prices" may constitute affirmative conduct). In contrast, "the fact that a defendant's acts are 'by nature self-concealing' is insufficient to show that the defendant has affirmatively misled the plaintiff as to the existence of the plaintiff's claim." *Animation Workers*, 87 F. Supp. 3d at 1215 (quoting *Conmar*, 858 F.2d at 505); *see also id.* (holding "secret meetings" and "efforts to 'minimize any written record'" were insufficient to show "misleading conduct 'above and beyond' the conspiracy itself" (citations omitted)). "Passive concealment of information is not enough to toll the statute of limitations . . . unless the defendant had a fiduciary duty to disclose information to the plaintiff." *Conmar*, 858 F.2d at 505 (citations omitted); *see also Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) ("Silence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure.").

Plaintiffs allege Defendants affirmatively misled them because "TWi's press release regarding the settlement made no mention of the $9.5 million payment it received from Takeda and did not disclose any information regarding Takeda's agreement not to launch a competing AG." (Dkt. No. 103 ¶ 248.) So, Plaintiffs only allege Defendants failed to disclose information, rather than allege Defendants made an affirmative, misleading statement or otherwise acted affirmatively to conceal information. But "merely 'passively conceal[ing]' material information is insufficient to toll the statute of limitations." *See Animation Workers*, 87 F. Supp. 3d at 1215 (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415-16 (9th Cir. 1987)). So, Plaintiffs have not plausibly alleged Defendants' affirmatively misleading acts.

United States District Court
Northern District of California

Plaintiffs contend Defendants' passive concealment is sufficient because by disclosing the settlement to a court or through a press release, TWi imposed on itself a duty to disclose all material information regarding the settlement.  Plaintiffs rely on *In re Glumetza Antitrust Litigation*, 611 F. Supp. 3d 848 (N.D. Cal. 2020), in which the court held the defendants' choice to disclose certain settlement terms created a duty "to include as much information as necessary to prevent misleading others." *Id.* at 863 ("'[H]alf-truths . . . can be actionable misrepresentations.'" (quoting *Univ. Health Servs. v. United States*, 579 U.S. 176, 188 (2016) (addressing False Claims Act claim))).  But the Ninth Circuit requires more: specifically, a plaintiff must allege "the defendant had a fiduciary duty to disclose information to the plaintiff." *See Conmar*, 858 F.2d at 505; *see also Rutledge*, 576 F.2d at 250 (considering passive conduct sufficient if "the relationship of the parties imposes a duty upon the defendant to make disclosure").  Because Plaintiffs do not allege any fiduciary relationship with Defendants which obligated Defendants to share information with them, Plaintiffs cannot assert fraudulent concealment based on passive conduct. *See Reveal Chat HoldCo LLC v. Meta Platforms, Inc.*, No. 21-15863, 2022 WL 595696, at *2 (9th Cir. Feb. 28, 2022) (affirming district court's rejection of fraudulent concealment because "the antitrust laws do not obligate Meta to share its motivations for its business decisions with the Developers"); *see also Animation Workers*, 87 F. Supp. 3d at 1216 ("That Defendants did not affirmatively disclose the details of their allegedly unlawful conspiracy to Plaintiffs is neither surprising nor sufficient.").  So, as Plaintiffs have not plausibly alleged Defendants affirmatively misled them, they are not entitled to tolling under the fraudulent concealment doctrine.

Defendants also argue Plaintiffs do not plausibly allege they lacked actual or constructive notice of the facts giving rise to their claims or acted with diligence in uncovering such facts. "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud." *Hexcel*, 681 F.3d at 1060 (quotation marks and citation omitted); *see also id.* ("It is enough that the plaintiff 'should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim.'" (quoting *Conmar,* 858 F.2d at 502).  "[T]he question of constructive knowledge and inquiry notice generally 'presents a question for the trier of fact.'" *In*

*re Animation Workers*, 123 F. Supp. 3d 1175, 1204 (N.D. Cal. 2015) (quoting *Volk*, 816 F.2d at 1417).  However, a plaintiff still "must plead with particularity the circumstances of the concealment and the facts supporting its due diligence."  *Conmar*, 858 F.2d at 502; *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) ("Averments of fraud must be accompanied by the who, what, when, where and how of the misconduct charged." (quotation marks and citation omitted)).

As to constructive notice, Plaintiffs allege "[i]t was not until TWi actually launched its AG product"—and, Plaintiffs contended at oral argument, Takeda did not launch its own AG—in January 2022 "that the nature and terms of Defendants' agreement was revealed."  (Dkt. No. 103 ¶ 249.)  However, Plaintiffs also allege the key terms were disclosed earlier: TWi's annual financial report disclosed Takeda's $9.5 million settlement payment, and TWi's press release indicated "TWi's AG rights would be exclusive."  (*Id.* ¶¶ 175, 182-183.)  *Cf. Glumetza*, 611 F. Supp. 3d at 863 (finding no constructive notice when the defendant "did not reveal the [key] provision until an earnings call" less than three years before suit).  In addition, rather than plead with particularity facts supporting their due diligence, Plaintiffs allege only they "had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence."  (Dkt. No. 103 ¶ 250.)

So, Plaintiffs have not plausibly alleged fraudulent concealment to justify tolling the statute of limitations.

### B.    Continuing Violation

An exception to 15 U.S.C. § 15b's four-year statute of limitations "exists for continuing violations."  *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (citing *Zenith Radio*, 401 U.S. at 338).  "A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured."  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (citations omitted); *see also Zenith Radio*, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute

14

United States District Court
Northern District of California

of limitations runs from the commission of the act." (citations omitted)).  "To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'"  *Samsung Elecs.*, 747 F.3d at 1202 (quoting *Pace Indus.*, 813 F.2d at 238).

In the price-fixing context, it is well established "that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser, and the statute of limitations runs from the date of the act."  *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)); *see also Klehr*, 521 U.S. at 189 ("Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." (quotation marks and citations omitted)).

Furthermore, in other contexts, the Ninth Circuit has held "non-legal actions taken pursuant to a pre-limitations period contract can lead a new cause of action to accrue . . . so long as the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract."  *Samsung Elecs.*, 747 F.3d at 1203.  For example, in *Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299 (9th Cir. 1986), when "a tourism company agreed to steer customers to preferred souvenir shops," the Ninth Circuit held "a cause of action accrued each and every time that a tourist was shepherded away from the plaintiff's non-preferred shop because even though the agreement predated the limitations period, the agreement itself did not 'immediately and permanently destroy' the plaintiff's business nor did it cause 'irrevocable, immutable, permanent, and final' injury."  *Samsung Elecs.*, 747 F.3d at 1203 (quoting *Hennegan*, 787 F.2d at 1301).  Similarly, in *Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*, 111 F.3d 1427 (9th Cir. 1996), the Ninth Circuit held "a power producer's refusal to wheel electricity in accordance with a pre-limitations contract constituted an overt act"

because "[e]ven though the anticompetitive agreement to divide the market between producers dated back to 1972, the anti-competitive acts of the parties to that agreement, taken pursuant to its terms, were sufficient to support an antitrust action 18 years later." *Samsung Elecs.*, 747 F.3d at 1203 (citing *Columbia Steel Casting*, 111 F.3d at 1144-45).

Plaintiffs allege a "cause of action accrued for Plaintiffs each time the Defendants sold a brand or generic Dexilant product at a supracompetitive price made possible by their anticompetitive conduct" because each sale "constituted another overt act in furtherance of their anticompetitive scheme." (Dkt. No. 103 ¶ 246.) Because the 2015 settlement agreement did not include Defendants' agreement to sell to Plaintiffs at supracompetitive prices, drawing all reasonable inferences in Plaintiffs' favor, Defendants' sales constitute "new and independent act[s]" and "not merely [] reaffirmation" of the settlement agreement. *See Samsung Elecs.*, 747 F.3d at 1202 (quotation marks and citation omitted); *see also In re Seroquel XR (Extended Release Quetiapine Furmarate) Antitrust Litig.*, No. 20-1076-CFC, 2022 WL 2438934, at *8 (D. Del. July 5, 2022) ("Defendants' sales to the Direct Purchasers did not constitute performance of the settlement agreements."). And, Plaintiffs' alleged antitrust injury did not occur—much less become complete—when Defendants reached their settlement agreement in 2015. *Cf. Samsung Elecs.*, 747 F.3d at 1202 (explaining overt act requirement eliminates cases in which "all of the harm occurred at the time of the initial violation"). Instead, Plaintiffs were injured each time Takeda chose to sell them its brand Dexilant at a supracompetitive price beginning on June 15, 2020, and each time Takeda and TWi chose to sell their brand and AG Dexilant, respectively, at a supracompetitive price after January 1, 2022. *See Zenith Radio*, 401 U.S. at 338 ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues."); *see also Samsung Elecs.*, 747 F.3d at 1202 (requiring overt act "inflict new and accumulating injury on the plaintiff" (quotation marks and citation omitted)).

Defendants argue Plaintiffs' allegations are insufficient because sales at supracompetitive prices only constitute overt acts in price-fixing conspiracies. But, again, drawing all reasonable inferences in Plaintiffs' favor, because the 2015 agreement gave Defendants market power to "bring[] about a series of unlawfully high priced sales over a period of years," the agreement is at

16

least analogous to a price-fixing conspiracy in which "each sale to the plaintiff[] starts the statutory period running again." *See Klehr*, 521 U.S. at 189 (cleaned up). Moreover, the Ninth Circuit has also held outside of the price fixing context "non-legal actions taken pursuant to a pre-limitations contract" can constitute overt acts "so long as the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract." *Samsung Elecs.*, 747 F.3d at 1203. Here, Takeda maintained the ability to charge competitive prices for brand Dexilant or introduce its own generic, and TWi maintained the ability to charge competitive prices for its generic AG. TWi also maintained the ability—notwithstanding the settlement—to push forward the patent litigation and aggressively seek ANDA approval to introduce its own generic earlier. So, Plaintiffs plausibly allege Defendants' sales at supracompetitive prices beginning on June 15, 2020 constituted overt acts.

In addition, the tying and monopolization cases Defendants rely on are not persuasively analogous. As to tying cases, Defendants rely on *Eichman v. Fotomat Corp.*, 880 F.2d 149 (9th Cir. 1989), in which a franchisee sued its franchisor over their 1968 lease agreement, alleged the agreement included an illegal tie, and argued his continued lease payments constituted a continuing violation. *Id.* at 153, 160. The Ninth Circuit refused to find a continuing violation because the franchisee had "entered into the lease himself" and suffered antitrust injury since he began making lease payments in 1968, so the franchisor's "passive receipt of profits from an illegal contract" was not an overt act. *Id.* at 160 (citing *Aurora Enters.*, 688 F.2d at 694); *see also Aurora Enters.*, 688 F.2d at 693-94 ("In 1966, plaintiff Xanadu knew that it was giving up its syndication rights when it signed a contract with defendant NBC.") However, unlike the *Eichman* and *Aurora Enterprises* plaintiffs, Plaintiffs were not parties to Defendants' 2015 agreement and suffered no antitrust injury upon its formation. More importantly, unlike the lease payments in *Eichman* and the syndication rights in *Aurora Enterprises*, which were terms of the allegedly illegal contracts, Defendants' 2015 settlement did not include an agreement to sell at supracompetitive prices. So, rather than "passive receipt of profits from an illegal contract," *Eichman*, 880 F.2d at 160, Defendants' alleged choices to sell their product at supracompetitive prices formed overt acts independent of the contract's terms.

17

Defendants' reliance on monopolization cases is similarly unavailing. In *Gamboa v. Apple Inc.*, No. 24-CV-01270-EKL, 2025 WL 1684890 (N.D. Cal. June 16, 2025), the plaintiffs sought to recover damages because "Apple still reap[ed] monopoly profits" 13 years after it "monopolized cloud storage through a one-time, immutable design decision in 2011." *Id.* at *5. But unlike *Gamboa*, Defendants' 2015 settlement did not cause an "'irrevocable, immutable, permanent, and final' injury" to Plaintiffs or the market. *See Samsung Elecs.*, 747 F.3d at 1203 (quoting *Hennegan*, 787 F.2d at 1301); *see also Multidistrict Vehicle Air Pollution*, 591 F.2d at 71-72 (in refusal to deal case, refusing to recognize continuing violation because "decisions not to purchase the [] devices from AMF" were "irrevocable, immutable, permanent and final" by 1965). Here, for many years after the settlement, TWi could have worked to obtain ANDA approval and introduce its own generic; Takeda could have introduced its own AG; and Defendants could have sold their products at competitive prices. *See Samsung Elecs.*, 747 F.3d at 1203 (finding new cause of action accrues "so long as the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract"). Courts have therefore treated overt acts in reverse payment and pay-for-delay cases differently. *See Gamboa*, 2025 WL 1684890, at *6; *Crowder v. LinkedIn Corp.*, No. 22-CV-00237-HSG, 2023 WL 2405335, at *3 (N.D. Cal. Mar. 8, 2023) (refusing to adopt approach from "price fixing and 'pay for delay' conspiracies").

Furthermore, Defendants fail to cite any case in which a court, considering a reverse payment claim, has rejected a plaintiff's continuing violation argument. Instead, as Plaintiffs note, courts considering a motion to dismiss reverse payment claims have consistently considered the defendants' sales at supracompetitive prices overt acts sufficient for a continuing violation. *See, e.g.*, *Glumetza*, 611 F. Supp. 3d at 861 ("[I]t is true that the [] agreement occurred in 2012, but the *conduct taken* to cause competitive harm continued well into the later four-year period."); *Mayor of Baltimore*, 995 F.3d at 132 ("Thus, each time that Actelion sold Tracleer to the plaintiffs at monopoly prices after the patent's expiration, it engaged in a new injurious overt act that commenced a new limitations period."); *Seroquel XR*, 2022 WL 2438934, at *8 ("Defendants' sales to the Direct Purchasers at supracompetitive prices were independent acts that caused the

18

Direct Purchasers' injuries and started new limitations periods."); *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices, & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1329 (D. Kan. 2018) ("[D]efendants engaged in new and additional acts each time they charged the allegedly inflated prices for the EpiPen."); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 385 (D.N.J. 2018) ("[A] new cause of action accrues to purchasers upon each overpriced sale of the drug." (cleaned up)); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 239 (D. Conn. 2015) ("[T]he federal antitrust claims are timely for all overcharges alleged to have been incurred within the four years preceding the filing of the claims."); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-MD-2343, 2013 WL 2181185, at *29 (E.D. Tenn. May 20, 2013) ("Plaintiffs have sufficiently alleged [Defendants'] acts resulted in Plaintiffs being overcharged for metaxalone well into the limitations period."); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 400 (D. Mass. 2013) ("Indulging all inferences in Plaintiffs' favor, then, it is reasonable to assume here that, every time the Direct Purchasers were overcharged for brand Nexium, they suffered a cognizable injury.").

Because Plaintiffs plausibly allege Defendants' sales at supracompetitive prices constituted overt acts and therefore a continuing violation, the Court does not grant Defendants' motion to dismiss on statute of limitations grounds in its entirety. *See Pre Con Indus.*, 720 F.3d at 1178 ("A claim may be dismissed as untimely pursuant to a 12(b)(6) motion only when the running of the statute [of limitations] is apparent on the face of the complaint."). However, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189 (citations omitted); *see also Glumetza*, 611 F. Supp. 3d at 862 ("[E]ach continuing violation (*i.e.*, each new sale) merely triggered the statute of limitations anew for *that act*."). So, the continuing violation doctrine does not allow Plaintiffs to recover for sales occurring more than four years before their first complaints: for Retailer Plaintiffs, before March 25, 2021, and for DPPs, before March 31, 2021. (Dkt. Nos. 103, 104.) And, as Plaintiffs have not plausibly alleged fraudulent concealment, the Court grants Defendants' motion to dismiss Plaintiffs' claims for injuries before March 2021 as barred by the antitrust statute of limitations.

19

## II.      SHERMAN ACT SECTION 1 CLAIMS

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  "Thus, to establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 988-89 (9th Cir. 2020) (cleaned up).  An unreasonable restraint can be shown through either a *per se* violation, "when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct," *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103-04 (1984), or a violation of the rule of reason, when the "restraint's harm to competition outweighs its procompetitive effects," *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

Plaintiffs allege two antitrust theories under Sherman Act Section 1: (1) a reverse payment claim subject to the rule of reason, and (2) a market allocation claim subject to the *per se* rule. Defendants move to dismiss both.

### A.      Reverse Payment Claim

In *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), the Supreme Court held "reverse payment settlements . . . can sometimes violate the antitrust laws" under the rule of reason.  *Id.* at 141, 158-59.  In *Actavis*, the FTC had challenged 2006 patent litigation settlements between the brand manufacturer Solvay and multiple generic manufacturers of Solvay's AndroGel product, including Actavis.  *Id.* at 144-45.  Specifically as to the Solvay-Actavis settlement, the FTC alleged Actavis agreed not to sell its generic until 2015 and to promote AndroGel to urologists, and Solvay agreed to pay Actavis $19-$30 million annually for nine years.  *Id.* at 145.  "According to the FTC, the true point of the payments was to compensate the generics for agreeing not to compete against AndroGel until 2015."  *Id.* (citations omitted).

The Eleventh Circuit had dismissed the FTC's complaint because "a reverse settlement payment agreement generally is 'immune from antitrust attack so long as its competitive effects fall within the scope of the [patent's] exclusionary potential.'"  *Id.* at 141 (citation omitted).  The Supreme Court reversed and held "reverse payments settlements . . . can [] violate the antitrust

United States District Court
Northern District of California

laws" when a patentee seeks to "exclude products or processes that do not actually infringe" the patent by making a "payment in return for staying out of the market" in order "to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market." *Id.* at 140, 147, 154, 157. However, because the same risk of anticompetitive effects does not exist when "a reverse payment reflects traditional settlement considerations, such as avoided litigation costs or fair value for services," reverse payment settlements should be evaluated under the rule of reason. *Id.* at 156. So, the Court held "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects." *Id.* at 158.

Plaintiffs allege a reverse payment because Takeda and TWi, before Takeda's patent infringement claims against TWi were finally resolved, entered into a settlement in which Takeda, the patentee, paid TWi, the alleged infringer. Plaintiffs also allege Takeda's payment was large and unjustified because Takeda paid TWi $9.5 million and also "paid TWi by effectively granting TWi a monopoly on sales of generic Dexilant" in 2022, earning TWi about $54.7 million, which "far exceeded any reasonable estimate of Takeda's saved future litigation expenses." (Dkt. No. 103 ¶¶ 174-177; *see also id.* ¶¶ 191-192 (alleging Takeda gave up "a large share of [2022 AG Dexilant] sales," totaling $328 million, it could have captured by launching its own AG); Case No. 25-cv-07646-JSC, Dkt. No. 1 ¶¶ 180-181, 196 (alleging Takeda could have captured half of the $328 million in 2022 sales through its own AG, and, accounting for royalty rates, TWi earned an incremental $54.7 million in revenue by not competing with Takeda's own AG).) In particular, Plaintiffs allege Takeda paid TWi "in return for staying out of the market" because TWi agreed to delay its generic's market entry from June 15, 2020 until January 1, 2022 . (*Id.* ¶ 173-174.) *See Actavis*, 570 U.S. at 154. So, Plaintiffs have plausibly alleged a large and unjustified reverse payment, which under *Actavis* supports an inference of significant anticompetitive effects. Plaintiffs therefore allege a reverse payment claim sufficient to survive a motion to dismiss. *See United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1075 (N.D. Cal. 2014) ("[P]laintiffs have plausibly alleged that the terms were large and unjustified reverse payments, which is

sufficient to support plaintiffs' theories of injury at this juncture."); *see In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 850, 865 (N.D. Cal. 2021) (holding the plaintiffs adequately pled unlawful reverse payments by alleging they were large and unjustified).

Defendants respond Plaintiffs have not plausibly alleged "a license to a second filer like TWi could violate the antitrust laws." (Dkt. No. 132 at 28.) As an initial matter, Defendants rely exclusively on *In re Actos End Payor Antitrust Litigation*, No. 13-CV-9244 (RA), 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated in part*, 848 F.3d 89 (2d Cir. 2017), which does not support their argument. There, the court considered antitrust claims based on an agreement between brand manufacturer Takeda and generic manufacturer Teva. *Id.* at *17-18. Because Teva was not the first filer, certain events would have needed to occur for Teva to launch its generic immediately after the allegedly infringed patent expired, but the court explicitly "[s]et[] aside th[is] series of inferences." *Id.* Instead, "the main flaw with Plaintiffs' argument is that it side-steps the relevant *Actavis* inquiry: was there a large, unexplained reverse payment from Takeda to Teva to settle the litigation?" *Id.* at *18. Because the only payments were from Teva to Takeda, there was no reverse payment, and therefore no plausible antitrust claim. *Id.* So, *Actos* does not indicate a reverse payment to a second filer cannot violate the antitrust laws.

To the contrary, in *Actavis*, the FTC alleged brand manufacturer Solvay's settlements with first-filer Actavis, ***as well as with later generic filers Paddock and Par***, violated the antitrust laws, and Defendants identify no language in *Actavis* suggesting the Supreme Court viewed the various settlements' risk of anticompetitive harm differently. *See Actavis*, 570 U.S. at 144-45. Instead, *Actavis* indicates plausible allegations of "a reverse payment, where large and unjustified, . . . risk[s] [] significant anticompetitive effects," and are therefore sufficient to survive a motion to dismiss. *Id.* at 158.

In any event, Plaintiffs do plausibly allege, absent the settlement, there would have been "no first filer exclusivities standing in the way of" TWi's launching its generic dexlansoprazole, as the first generic dexlansoprazole, in June 2020. (Dkt. No. 103 ¶ 112.) First, Plaintiffs allege first-filers Par and Impax forfeited their 180-day exclusivity "due to their delays in getting their products tentatively approved" within 30 months of ANDA filing. (*Id.* ¶ 212; *see also id.* ¶ 122

United States District Court
Northern District of California

(noting Par obtained tentative approval on December 26, 2013, more than 30 months after August 25, 2010 filing).) *See* 21 U.S.C. § 355(j)(5)(D)(i)(IV).  Second, Plaintiffs allege although Judge Spero's judgment prevented TWi from obtaining final ANDA approval before June 15, 2020, when the '282 Patent expired, the judgment also prevented Par and Impax from obtaining final ANDA approval until December 20, 2020, when the '058, '276, '971, and '276 Patents expired. So, "absent being overturned on appeal, . . . TWi effectively leapfrogged Par and Impax in its ability to come to market."  (Dkt. No. 103 ¶ 143.)  Takeda's "post-trial press statement that '[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020'" further supports a plausible inference TWi would have, absent settlement, launched its generic dexlansoprazole around June 15, 2020.  (*Id.* ¶ 144.)  So, drawing reasonable inferences in Plaintiffs' favor, Plaintiffs' allegations plausibly support an inference the settlement led TWi to delay its launch from June 15, 2020 until January 1, 2022 and therefore delayed market entry for the first generic dexlansoprazole.

Defendants contend TWi might not have obtained tentative and final ANDA approval in time to launch its generic in June 2020, TWi might have lost to Takeda in the patent infringement suits, the FDA might not have deemed Par and Impax to have forfeited their first-filer exclusivity, or the Par and Impax generics might have entered the market before November 2022.  All Defendants' arguments, however, ask the Court to draw inferences about the hypothetical world which would have existed absent settlement in Defendants' favor.  *Cf. Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005) ("On a motion to dismiss for failure to state a claim, the court must . . . draw[] all reasonable inferences from the complaint in [the plaintiff's] favor.").  But drawing inferences in Plaintiffs' favor, Plaintiffs have plausibly alleged Defendants' settlement had anticompetitive effects regardless of whether TWi was the first filer, and because *Actavis* requires only allegations of a large and unjustified reverse payment, Plaintiffs have stated a reverse payment claim.

Defendants also argue Plaintiffs have not plausibly alleged either the $9.5 million payment *or* Takeda's allowing TWi to launch an AG Dexilant in 2022 and agreeing not to launch its own AG formed a "large and unjustified" payment rather than a "rough approximation of the litigation

23

expenses saved." *See id.* at 156, 158. But Plaintiffs argue "the total value of the reverse payments consists of the $9.5 million cash payment *and* the . . . estimated value of the generic exclusivity." (Dkt. No. 144 at 30 (emphasis added); *see also* Dkt. No. 103 ¶¶ 174-177, 191-192; Case No. 25-cv-07646-JSC, Dkt. No. 1 ¶¶ 180-181, 196.) Such payments together "far exceeded any reasonable estimate of Takeda's saved future litigation expenses" because "the core claims had already been tried before the district court and fully briefed and argued to the appellate court." (Dkt. No. 103 ¶ 176.) So, drawing reasonable inferences in Plaintiffs' favor, Takeda's payments formed a large gift to TWi and were not justified by "traditional settlement considerations, such as avoided litigation costs or fair value for services." *Actavis*, 570 U.S. at 156; *see also Xyrem*, 555 F. Supp. 3d at 855-56 (holding brand manufacturer's alleged agreement not to launch its own AG was valuable payment).

Defendants' contention Takeda's payment is in fact a "'rough approximation' of saved litigation expenses" asks the Court to instead draw inferences in Defendants' favor. (Dkt. No. 132 at 32.) So, at the motion to dismiss stage, Defendants' contention is unavailing. *Compare Aggrenox*, 94 F. Supp. 3d at 245-46 (upon motion to dismiss, considering sufficient the plaintiffs' allegations of a large and unjustified payment); *Teikoku Pharma USA*, 74 F. Supp. 3d at 1065 (same); *with In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-MD-02966-RS, 2024 WL 4023561, at *10 (N.D. Cal. Aug. 26, 2024) (at summary judgment, holding plaintiffs failed to demonstrate payments exceeded saved litigation costs). Furthermore, Defendants' inferential disputes about other generics' market entry, TWi's alleged lack of first-filer status, or TWi's ANDA approval timeline do not affect the plausibility of Plaintiffs' allegations of a large and unjustified payment. Defendants also argue Takeda had the "exclusive right to decide whether and when to market an AG," including whether to "license a third party to market an AG." (Dkt. No. 132 at 33-34.) But that Takeda had the right to sell or license an AG does not exempt Takeda from antitrust liability for leveraging that right as "payment in return for staying out of the market." *Actavis*, 570 U.S. at 154.

So, the Court denies Defendants' motion to dismiss Plaintiffs' reverse payment claim as insufficiently pled.

24

United States District Court
Northern District of California

### B.    *Per Se* Market Allocation Claim

"[N]aked horizontal restraints are always analyzed under the *per se* standard," and naked horizontal restraints "include agreements among actual or potential competitors to . . . divide markets." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) (citing *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam)).  However, "not all horizontal restraints are analyzed pursuant to the *per se* standard." *Id.*  Ultimately, the *per se* standard applies only to a "small group of restraints" which "always or almost always tend to restrict competition and decrease output" and are therefore "conclusively presumed to be unreasonable because of their pernicious effect on competition and lack of any redeeming virtue." *Id.* at 1108 (cleaned up); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979) ("[I]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations." (cleaned up)).

Defendants move to dismiss Plaintiffs' *per se* theory of a market allocation claim.  As to market allocation, Plaintiffs allege Defendants violated Sherman Act Section 1 by forming a horizontal agreement to allocate markets for brand and generic Dexilant.  So, as an "agreement[] among actual or potential competitors to . . . divide markets," Defendants' settlement may be appropriate for *per se* treatment.  *See Aya Healthcare Servs.*, 9 F.4th at 1109 (citation omitted).  And Defendants' argument *Actavis* foreclosed *per se* treatment of Plaintiffs' market allocation claim is unavailing.  Although the *Actavis* defendants' settlement arguably included a market allocation agreement, the Supreme Court only considered the FTC's reverse payment claim.  *See Actavis*, 570 U.S. at 141; *cf. id.* at 158-159 (rejecting FTC's argument the "quick look" rather than "rule of reason" standard should apply to "reverse payment settlements").

However, even "a market allocation agreement . . . traditionally subject to per se treatment will only be found to be per se illegal if it 'facially appears to be one that would almost always tend to restrict competition and decrease output,' *i.e.*, if it is a naked restraint on trade." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013) (quoting *Nat'l Collegiate Athletic Ass'n*, 468 U.S. at 100).  And, as the Supreme Court explained in *Actavis*, "the likelihood of . . . anticompetitive effects" for this type of agreement "depends upon its size, its scale in

relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Actavis*, 570 U.S. at 159. So, whether the *per se* rule is appropriate will depend on "factual evidence relating to th[is] agreement's formation and character." *eBay*, 968 F. Supp. 2d at 1039. For this reason, courts have "declined to determine the applicability of the *per se* rule on a motion to dismiss, finding 'that decision is more appropriate on a motion for summary judgment." *NSS Labs, Inc. v. Symantec Corp.*, No. 18-CV-05711-BLF, 2019 WL 3804679, at *6 (N.D. Cal. Aug. 13, 2019) (quoting *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012)); *see also GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 449 (N.D. Cal. 2017) ("[I]t is not necessary to determine whether the *per se* or rule of reason analysis applies at [the motion to dismiss] stage."); *Pac-12 Conference v. Mountain West Conference*, No. 24-CV-06685-SVK, 2025 WL 2781313, at *7 (N.D. Cal. Sept. 30, 2025) ("The Court declines to determine at this early pleading stage whether the [provision] . . . is subject to *per se* or rule of reason analysis.").

If Plaintiffs ultimately present evidence Defendants' settlement was a "naked horizontal restraint" with "no purpose except stifling of competition," or without "any redeeming virtue," the *per se* rule may be appropriate. *See Aya Healthcare Servs.*, 9 F.4th at 1109 (quotation marks and citations omitted). However, because Plaintiffs confirmed at oral argument they may seek to prove their market allocation claim under either the *per se* rule or the rule of reason, the Court does not need to decide now which rule applies.

So, the Court denies Defendants' motion to dismiss Plaintiffs' *per se* market allocation claim.

## III.   ANTITRUST INJURY

"A plaintiff may only pursue an antitrust action if it can show 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Am. Ad Mgmt., Inc. v. Gen. Telephone Co. of California*, 190 F.3d 1051, 1055 (1999) (quoting *Atlantic Richfield*, 495 U.S. at 334). "[W]hether Plaintiffs' injury 'flows from' Defendants' anticompetitive acts depends on 'common law principles of

United States District Court
Northern District of California

causation.'" *Xyrem*, 555 F. Supp. 3d at 872 (quoting *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1169 (9th Cir. 2013)). "'Causation is an intensely factual question that should typically be resolved by a jury.'" *Id.* (quoting *Pac. Shores Properties*, 730 F.3d at 1168). "Thus, 'once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment'—let alone a motion to dismiss—'on the ground of absence of causation.'" *Id.* (quoting *Pac. Shores Properties*, 730 F.3d at 1168)).

Plaintiffs have alleged (1) between June 15, 2020 and January 1, 2022, TWi agreed not to sell its generic, so Takeda retained and exercised its market power to sell them its brand dexlansoprazole at supracompetitive prices; and (2) after January 1, 2022, because Takeda agreed not to launch its own generic, TWi and Takeda exercised their market power to sell them generic and brand dexlansoprazole, respectively, at supracompetitive prices. So, drawing inferences in Plaintiffs' favor, Defendants' ability and choice to sell at supracompetitive prices are "expected consequence[s]" of their agreement. *See Xyrem*, 555 F. Supp. 3d at 872. Plaintiffs have therefore plausibly alleged antitrust injury to withstand a motion to dismiss. However, Defendants contend two links in Plaintiffs' chain of causation are too speculative to support a plausible inference Plaintiffs' injuries flowed from Defendants' anticompetitive acts.

### A.      Outcome of Patent Litigation

Defendants argue Plaintiffs' claims depend on a speculative assumption TWi would have, absent the agreement, defeated Takeda's patent infringement claims. However, the Supreme Court's reasoning in *Actavis* undermines Defendants' argument, at least for purposes of a motion to dismiss. In *Actavis*, the Supreme Court emphasized "[i]t is normally not necessary to litigate patent validity to answer the antitrust question." *Actavis*, 570 U.S. at 157. Instead:

> [In *Actavis*,] the Supreme Court reasoned that "even a *small* risk of [patent] invalidity" often results in a reverse payment that "likely seeks to prevent the risk of competition"—a "consequence constitut[ing] the relevant anticompetitive harm." *Actavis*, 570 U.S. at 157. . . . Thus, "a court, by examining the size of the [challenged] payment, may well be able to assess its likely anticompetitive effects along with its potential justifications *without litigating the validity of the patent.*" *Id.* at 158. "In a word, the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness,

27

all *without forcing a court to conduct a detailed exploration of the validity of the patent* itself." *Id.* (emphasis added).

*Xyrem*, 555 F. Supp. 3d at 873 (cleaned up). So, under *Actavis*, at the motion to dismiss stage, plaintiffs need not plausibly allege how courts would have—absent settlement—resolved the underlying patent litigation. *See id.* at 872 ("Plaintiffs need not allege how the Generic Defendants would have prevailed in the patent litigations."); *see also Teikoku Pharma USA*, 74 F. Supp. 3d at 1072 ("I do not need to analyze the validity of the patents in the settled litigation in order to find the allegations adequate to meet the rule of reason."). Instead, factual allegations regarding the size of and justifications for the settlement create a plausible inference the settlement was anticompetitive and therefore caused the plaintiffs' antitrust injury. *See In re Glumetza Antitrust Litig.*, No. C 18-05822 WHA (consolidated), 2021 WL 1817092, at *13 (N.D. Cal. May 6, 2021) ("[T]he circumstances of the settlement itself betray defendants' doubts in the infringement case."); *see also Teikoku Pharma USA*, 74 F. Supp. 3d at 1075 ("[P]laintiffs have plausibly alleged that the [settlement] terms were large and unjustified reverse payments, which is sufficient to support plaintiffs' theories of injury at [the motion to dismiss stage]."). Because, as explained above, Plaintiffs have plausibly alleged Takeda's large and unjustified reverse payment, the Court denies Defendants' motion to dismiss Plaintiffs' antitrust claims for failure to plausibly allege a chain of causation based on the outcome of the patent infringement claims.[7]

In their reply brief and at oral argument, Defendants contended *Actavis* does not govern Plaintiffs' burden to allege antitrust injury. It is true *Actavis* did not address antitrust injury because the FTC was the plaintiff and, unlike Plaintiffs, was not required to allege the same antitrust injury. *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 n.10 (9th Cir. 2021) ("Unlike the United States government, which is authorized to sue anyone who violates the antitrust laws, a private antitrust plaintiff must show 'standing' to sue."). However, Defendants

---

[7] Defendants cite several cases in which district courts dismissed the plaintiffs' claims because their theory of causation relied on speculative allegations about their success in the patent litigation. As none of these cases considered the cited language from *Actavis*, the Court does not find them persuasive. *See, e.g.*, *Actos*, 2015 WL 5610752, at *27; *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 843-45 (N.D. Ill. 2020); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 201-07 (E.D.N.Y. 2003) (preceding *Acatvis*); *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, Nos. 19-CV-7532 (ES) (MAH), 21-CV-20451 (ES) (MAH), 2024 WL 2861865, at *84 (D.N.J. June 6, 2024).

United States District Court
Northern District of California

rely exclusively on *Apotex, Inc. v. Cephalon, Inc.*, 255 F. Supp. 3d 604, 614 n.3 (E.D. Pa. 2017), which, in response to the defendants' motion in limine, held evidence of a "prior patent ruling [] highly probative" to the plaintiffs' causation theory and therefore admissible at trial. *Id.* at 614. So, *Apotex* does not address the question here: at the motion to dismiss stage, what must Plaintiffs allege regarding the patent litigation's outcome absent settlement to plausibly allege antitrust injury? And although *Actavis* only addressed the pleading requirements for the merits of an antitrust claim, rather than for a private plaintiff's antitrust injury, its reasoning indicates plausible allegations of a large and unjustified reverse payment suffice for both. As the Supreme Court explained, "[a]n unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival." *Actavis*, 570 U.S. at 157. *Actavis* considered such a fact sufficient to allege an antitrust claim because it "suggests that the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market—the very anticompetitive consequence that underlies the claim of antitrust unlawfulness." *Id.* But "that the patentee has serious doubts about the patent's survival" also creates a plausible inference the challenger would have ultimately succeeded in the patent litigation. *Id.* So, although, later in the case, Plaintiffs may need further evidence to prove Defendants' conduct caused their antitrust injury, *Actavis*'s reasoning indicates a large and unjustified reverse payment is sufficient to plausibly allege causation and survive a motion to dismiss.

Nevertheless, Plaintiffs also contend even if they would not have succeeded in the patent litigation, they can show antitrust injury because, but-for Defendants' agreement, TWi would have launched the generic product by June 15, 2020 by launching either "'at-risk' (that is, while the patent litigation was still pending)" or "via a lawful settlement agreement that provided for an earlier [TWi] entry date without a large reverse payment from [Takeda] to [TWi]." *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 720 (N.D. Ill. 2016); *see also Teikoku Pharma USA*, 74 F. Supp. 3d at 1073 (recognizing similar theories of injury); *Xyrem*, 555 F. Supp. 3d at 876 (same). However, although Plaintiffs may be able to plausibly allege these theories, they have not pointed to any factual allegations in their complaints which do so. *See Teikoku Pharma USA*, 74 F. Supp.

3d at 1073 (explaining "[w]hether a generic manufacturer is willing to risk treble damages from a patent infringement suit by selling a generic drug at risk is generally a factual issue" and considering factual allegations sufficient to survive motion to dismiss); *see also Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (quotation marks and citation omitted)).

So, the Court does not dismiss Plaintiffs' claims on the ground Plaintiffs' allegations regarding the patent litigations' outcome are too speculative.

### B.    Timeline for ANDA Approval

Defendants also argue Plaintiffs do not plausibly allege their injuries flowed from Defendants' agreement because TWi did not have FDA authorization to launch its own ANDA until September 2022, and so could not have launched its own generic by June 15, 2020.  The Court disagrees.

Plaintiffs allege although Anchen/TWi's ANDA was filed before May 2011, the Defendants' 2015 agreement "disincentivized TWi from aggressively seeking earlier approval and eliminated the need for FDA to act on TWi's application sooner," but absent the agreement, "the likelihood of the FDA approving TWi's ANDA prior to June of 2020 is [] high."  (Dkt. No. 103 ¶¶ 211, 214.)  So, Plaintiffs allege facts supporting a plausible inference TWi would have—in a hypothetical world without the challenged 2015 settlement—obtained ANDA approval by June 2020.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 788 (9th Cir. 2021), *reh'g en banc granted*, 5 F.4th 950 (9th Cir. 2021), *on reh'g en banc*, 31 F.4th 651 (9th Cir. 2022), *cert. denied sub nom.*, *Starkist v. Olean Wholesale Grocery Coop, Inc.*, 143 S. Ct. 424 (2022) ("To establish impact in any antitrust action . . . requires comparing the actual world with a 'hypothetical' world that would have existed 'but for' the defendant's unlawful activities." (cleaned up)).  Furthermore, "[d]ismissal at this early stage on the basis of speculation about possible and not inherently more plausible alternative causes would be premature." *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 101 (2d Cir. 2017); *see also In re Amitiza Antitrust Litig.*, No. 21-CV-11057-RGS, 2022 WL 17968695, at *3 (D. Mass. Dec. 27, 2022) (holding similar

"allegations suffice to create a factual inference of a link between the FDA's delay in approving the Par ANDA and the 2014 Settlement Agreement sufficient to defeat a motion to dismiss."); *Seroquel XR*, 2022 WL 2438934, at *12 ("Although evidence produced during discovery may ultimately show that Handa/Par would not have obtained final FDA approval before November 1, 2016, for the purposes of the pending motions [to dismiss], I am required to accept the operative complaints' allegations as true and construe them in light most favorable to Plaintiffs.").

So, the Court denies Defendants' motion to dismiss Plaintiffs' claims for failure to plausibly allege their antitrust injury flowed from Defendants' violations.

## IV.    CLAIMS AGAINST BORA AND UPSHER

"[W]hile detailed defendant by defendant allegations are not necessary, an antitrust complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1066 (N.D. Cal. 2015) (quotation marks and citation omitted). "Although Plaintiffs will need to provide evidence of each Defendant['s] participation in any conspiracy, they now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1152-53 (N.D. Cal. 2023) (quotation marks and citation omitted).

Defendants argue Plaintiffs have not plausibly alleged claims against Bora and Upsher. Plaintiffs allege Bora acquired TWi in October 2022; in July 2024, Bora acquired Upsher, and merged it with and made it the successor to TWi; and both Bora and Upsher benefited from the 2015 agreement. (Dkt. No. 103 ¶¶ 20-21.) Plaintiffs further allege because "Bora and TWi had been negotiating this deal for a period of time, [] Bora, exercising its due diligence, would have known of" the 2015 agreement. (*Id.* ¶ 35.) Similarly, Upsher, by merging with TWi "became fully aware of and supported TWi's Agreement with Takeda." (*Id.* ¶ 37.) None of Plaintiffs' allegations create a plausible inference Bora and Upsher formed "an agreement and [made] a conscious decision . . . to join" the alleged antitrust violations. *See Capacitors*, 106 F. Supp. 3d at 1066. Even given Plaintiffs' plausible allegations of Takeda's and TWi's continuing violations,

31

Plaintiffs do not plausibly allege Bora and Upsher participated in choices to sell the AG Dexilant at supracompetitive prices.

Plaintiffs also contend Bora and Upsher assumed TWi's liabilities through merger or mere continuation. "It is a general principle of corporate law deeply ingrained in our economic and legal system that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quotation marks and citations omitted). So, "[a] purchaser of a company does not assume the seller's liabilities unless: (1) there is an express or implied agreement of assumption; (2) the transaction amounts to a merger or consolidation of the corporations; (3) the purchasing corporation is a mere continuation of the seller; or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1031 (N.D. Cal. 2007) (citing *Ray v. Alad Corp.,* 19 Cal. 3d 22, 28 (1977)). Here, Plaintiffs fail to allege facts plausibly supporting an inference Bora or Upsher assumed TWi's liabilities as a result of the merger. *See No Cost Conf., Inc. v. Windstream Commc'ns., Inc.*, 940 F. Supp. 2d 1285, 1299 (S.D. Cal. 2013) (requiring allegations the defendant assumed liabilities but considering "conclusory allegation [] insufficient" and requiring the plaintiff to "plead the existence of a contract and its terms which establish the obligation in issue" (cleaned up)). Plaintiffs also provide no facts alleging mere continuation. *See Capacitors*, 106 F. Supp. 3d at 1067 ("[P]laintiffs have made nothing but the conclusory allegation of mere 'continuation.' That is not enough.").

Because Plaintiffs have not plausibly alleged Bora's and Upsher's participation in the alleged antitrust violation, the Court grants Defendants' motion to dismiss Bora and Upsher as defendants with leave to amend. *Cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 11109, 1117 (N.D. Cal. 2008) (allowing the plaintiffs leave to amend to "include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy").

## V.    SEALING MOTION

There is a right of public access to judicial records and documents. *See* Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). In considering motions to seal, courts recognize "a

strong presumption in favor of access is the starting point." Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006) (cleaned up). When a party seeks to seal judicial records relating to motions that are "more than tangentially related to the underlying cause of action," *Ctr. for Auto Safety v. Chrysler Grp.*, 809 F.3d 1092, 1099 (9th Cir. 2016), the party bears the burden of overcoming the presumption with "compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Kamakana*, 447 F.3d at 1178-79 (cleaned up). There is an exception when a party seeks to seal materials "unrelated, or only tangentially related, to the underlying cause of action." *Id.* at 1179. In such instance, "a party need only satisfy the less exacting 'good cause' standard." *Ctr. for Auto Safety*, 809 F.3d at 1097.

Takeda moves to seal "competitively-sensitive financial terms" in the Defendants' 2015 settlement agreement, attached as an exhibit to Defendants' motion to dismiss reply brief. (Dkt. No. 148 at 2.) As Takeda acknowledges, the "compelling reasons" standard applies to the parties' motion to dismiss filings. *See Ctr. for Auto Safety*, 809 F.3d at 1098 (applying compelling reasons standard to motions to dismiss). Compelling reasons exist if the documents at issue are "sources of business information that might harm a litigant's competitive standing." *Id.* at 1097 (citation omitted). Takeda asks to seal "seven discrete financial terms" in Defendants' 2015 settlement specifying the "manufacturing costs and royalty rates TWi agreed to pay to Takeda for the right to distribute an [AG] dexlansoprazole product." (Dkt. No. 148 at 3.) Takeda declares it considers such costs and rates "highly confidential business information" which, if disclosed, "would cause serious [competitive] harm to Takeda" in future licensing and distribution negotiations. (Dkt. No. 148-1 ¶ 7.)

The Court agrees there are compelling reasons to seal the manufacturing cost and royalty rate information in the 2015 settlement. *See In re Electronic Arts, Inc.*, 298 F. App'x 568, 569-70 (9th Cir. 2008) (holding there were compelling reasons to seal "the pricing terms, royalty rates, and guaranteed minimum payment terms found in . . . the 2006 Licensing Agreement"); *see also Exeltis USA Inc. v. First Databank, Inc.*, No. 17-CV-04810-HSG, 2020 WL 2838812, at *1 (N.D. Cal. June 1, 2020) ("[C]onfidential business information in the form of license agreements,

33

financial terms, details of confidential licensing negotiations, and business strategies satisfies the compelling reasons standard." (quotation marks and citation omitted)); *FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2019 WL 95922, at *3 (N.D. Cal. Jan. 3, 2019) ("[T]o the extent the instant motion seeks to seal information that . . . divulges terms of confidential contracts, contract negotiations, or trade secrets, . . . compelling reasons exist."). Furthermore, Takeda's requests are narrowly tailored, and Plaintiffs do not oppose Takeda's sealing motion.

So, the Court GRANTS Takeda's administrative motion to seal discrete financial terms in the 2015 settlement.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion to dismiss as to: (i) Retailer Plaintiffs' alleged injuries before March 25, 2021; (ii) DPPs' alleged injuries before March 31, 2021; and (iii) Plaintiffs' claims against Bora and Upsher. These claims are dismissed with leave to amend, including amendment, if any, of the fraudulent concealment allegations. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) ("[The] court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." (quotation marks and citation omitted)). The Court otherwise DENIES Defendants' motion to dismiss Retailer Plaintiffs' and DPPs' claims and DENIES Defendants' motion to dismiss End Payer Plaintiffs' claims as moot in light of their voluntary dismissal.

Plaintiff's deadline to file an amended complaint, if any, is February 26, 2026. Plaintiff may not add any new claims or defendants without prior leave of court. The Court will hold a further case management conference on March 4, 2026 at 2:00 p.m. via Zoom video. A joint case management conference statement is due one week in advance.

This Order disposes of Docket Nos. 132 and 148.

**IT IS SO ORDERED.**

Dated: February 6, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

34